AMERICAN INS. CO., (CARPENTER v.)

[See Carpenter v. American Ins. Co., Case No. 2,428.]

AMERICAN INS. CO., (HOLBROOK v.)

[See Holbrook v. American Ins. Co., Case No. 6,589.]

## Case No. 303.

The AMERICAN INS. CO. et al. v. JOHNSON.

[1 Blatchf. & H. 9.][1]

District Court, S. D. New York. Sept. 15, 1827.

ADMIRALTY JURISDICTION — PARTIES—MARITIME TRANSACTIONS—SALVAGE.

1. Parties whose interests rest upon a cause of action common to all, may unite in the same libel in admiralty, though as between themselves their interests are separate and distinct.

2. A libel in personam, resting upon a common cause of action, may be filed for the libelants and for all others interested, whenever the whole subject matter can be disposed of in one suit.

3. A libel may be amended on motion by striking out unnecessary and impertinent allegations.

4. Admiralty courts have jurisdiction equally in personam and in rem.

5. When admiralty jurisdiction has once attached, it is not divested by reason of any further acts done upon land in continuation of the maritime act which gave jurisdiction.

6. Admiralty jurisdiction, when administered under the restrictions of the English jurisprudence, is co-extensive with the ebbing and flowing of the tide.

7. The test of admiralty jurisdiction is whether the transaction is of a maritime character.

[Cited in The Richard Busteed, Case No. 11,764; Five Hundred and Twenty-Eight Pieces of Mahogany, Id. 4,845.]

8. A party deprived of his property on the high seas in any manner has, as a general principle, his remedy in admiralty.

[Cited in Five Hundred and Twenty-Eight Pieces of Mahogany, Case No. 4,845.]

9. Where money is paid by the owner of property to the purchaser of it under an unauthorized sale to satisfy a claim against it for salvage, if it is paid for the purpose of recovering possession of the property, and with an express reservation of all rights, the owner is not prevented from maintaining an action against the salvor founded upon the wrongful sale.

10. The salvor in such case, if he has not been guilty of an intentional tort, is liable only to the extent of the salvage received by him.

11. A salvor forfeits all claims to salvage by neglecting to inform the salved vessel beforehand of an imminent and secret danger known to him, and against which he is able to warn her.

12. But he may be entitled to a compensation for services performed, although his conduct has been such as to forfeit all claims to a salvage remuneration.

13. Testimony taken ex parte is to be received with the greatest caution.

In admiralty. This was a libel in personam, in behalf of ten Marine Insurance Companies of the city of New-York [against

[1][Reported by Samuel Blatchford, Esq., and Francis Howland, Esq.]

Charles Johnson.] The libellants were underwriters upon the cargo of the brig Hercules, by twenty-eight several policies, to the amount of $151,875, for a voyage from New-York to Mobile. The brig sailed with a cargo valued at $180,000, and, in September, 1825, grounded on Carysfort reef on the coast of Florida. The respondent, who was master of a wrecking schooner, saw the Hercules the day before she grounded. At the time the two vessels came in sight of each other the wind was N. E., the schooner standing S. W. by S., on a direct course to Key West, and the brig about S. S. E. The schooner was to the windward, and passed the brig the same day. The vessels were about two miles apart. There was evidence to show that the respondent believed the brig to be in danger of running ashore, but it did not clearly appear whether it would have been practicable for him to approach near enough to warn her of her danger, the seamen of the two vessels, who were the witnesses, varying in their representations on this point, according to their situations and apparent prepossessions. No attempt was made on the part of the schooner to approach the brig, or to give her any notice, or to put her on her guard. After the accident, the respondent, with two wrecking vessels, came to the rescue of the brig, and got her off the reef. The brig was thought to be in a good deal of peril, and the respondent took possession of her at the request of her master. After depositing a large part of her cargo in the two wrecking vessels, the respondent navigated the brig to Key West. Seaman, the master of the brig, did not at first show any unwillingness to go there, though, after the brig had started, he requested the respondent to proceed to Mobile, her port of destination; but the respondent, who had shown a strong preference for Key West from the first, resolved to take her there. Proceedings to obtain salvage were instituted by the respondent in the territorial court of Florida, which awarded 31¼ per cent. of the value of the brig and her cargo, and, under the decree of the court, the vessel was sold at auction at Key West for $1,531 12, and the cargo for $77,853. The salvage money was finally adjusted at $25,006 27. The respondent purchased property at the sale to the amount of $9,046. The master of the brig was examined as a witness in the Florida court, but did not acquiesce in the award of salvage, and attempted, without success, to enter a formal protest against the sale of the vessel and cargo. Although the property was sold at a sacrifice, it did not appear that the sale was fraudulent, or that the respondent was guilty of any bad faith. The greater number of the purchasers who attended the sale were from Havana and Matanzas. The owners of the cargo abandoned it to the libellants, who sent one Earle, as an agent, to Key West. He found. on his arrival there, that the brig and her cargo were already

sold. The nearest court then in session was held at St. Augustine, and, before he could have gone there and returned, the goods would have been taken beyond its jurisdiction. Under these circumstances, he offered $72,500 to recover possession of the brig and her cargo from their respective purchasers, but with an express reservation of all his rights, and with the open assertion that he ransomed the goods as if from pirates. The $72,500 was finally given to one Whitehead. a member of the firm of Greene & Co., which had sold the brig and cargo at auction; and that firm agreed, for that sum, to recover back the brig and her cargo, and return them to Earle. This was done. The libel prayed that the salvage money be refunded, and that the $72,500 paid to the respondent and his associates to redeem the vessel be decreed to the libellants, with costs and damages.

The respondent filed a plea to the jurisdiction of the court, setting forth that the territorial government of Florida had authority to pass any laws not inconsistent with the laws and constitution of the United States, and that, on the 4th of July, 1823, they passed an act entitled "An act concerning wreckers and wrecked property," prescribing certain formalities, according to which the brig and her cargo had been sold, as would appear by a copy of the record of the territorial court of Florida. To this plea the libellants demurred. In March, 1826. this court (Van Ness, district judge) gave judgment for the libellants upon the demurrer, with leave to the respondent to answer over. The grounds of the decision were, that all cases of admiralty and maritime jurisdiction were, by the 9th section of the judiciary. act of September 24, 1789, (1 Stat. 76,) originally cognizable in the United States district courts exclusively; that salvage was a case of admiralty and maritime jurisdiction; that the United States district courts had exclusive original cognizance of a case of salvage, unless congress had conferred jurisdiction on some other tribunal; that congress had not granted to the legislative council of Florida authority to establish a court with jurisdiction over cases of salvage on the high seas; and that such a court was unconstitutional and its acts were void. [See note at end of case.] After his plea was overruled, the respondent answered to the merits, and incorporated in his answer the substance of the plea. The cause was then heard upon pleadings and proofs. The evidence consisted mostly of depositions taken before a commissioner, though the same witnesses were in some instances examined both before the commissioner and in court. The opinion of the court supplies all the facts necessary to an understanding of the case.

Beverly Robinson and William Slosson, for libellants.

Robert Tillotson and Seth P. Staples, for respondent.

BELTS, District Judge. There are three objections raised upon matters of form to the libellants' recovery, which it may be well to consider before proceeding to the merits of the case.

It is insisted, first, that the libellants show no joint interest or common cause of action which entitles them to unite in this action. Points of practice and forms of pleading have for ages formed the most perplexing and entangled subjects of litigation in the jurisprudence we have adopted in this country. Those courts which derive their rules of procedure from the civil law have been generally supposed to be most free from this difficulty. Yet, on the other hand, it is imputed to them that they are destitute of any distinct principles in this behalf, which may serve to insure uniformity in their procedure, or to modify the mere discretion which courts may be prone to apply in dictating for each case the law deemed most fit for it. It has been adjudged that in certain branches of the practice of a court of admiralty, the technical niceties of the common law are not to be regarded. The Merino, 9 Wheat. [22 U. S.] 391; The Samuel, 1 Wheat. [14 U. S.] 9; Locke v. U. S., 7 Cranch, [11 U. S.] 339. And there might probably be no incongruity in applying that doctrine to the whole extent of the jurisdiction of the court. The supreme court has decided that in cases of information in a court of admiralty, it is enough to set out the offense so as to bring it within the statute upon which the information is founded, and to give notice to the opposite party of the charge he is called upon to answer. This is, unquestionably, the true spirit of all pleadings; and it will not be denied that there is a higher philosophy in it than there is in determining the sufficiency of a pleading by merely ascertaining its conformity to some formula which was contrived for general application, and not framed with a view to the facts or circumstances to be actually brought before the court. Still it leaves much to discretion, and the justness with which the principle may be carried out in practice, will depend upon the competency of the magistrate who is called upon to administer it.

It does not belong to the functions of this court to enact a system for the correction of such supposed defects. Its province is to inquire whether there are any determinate rules established which regulate the matter. If there are none, its duty is to bring the case within the analogy of such as are most consonant to the principles regulating the course of courts of maritime jurisdiction. A research into the sources of the practice of this court affords very little light on the subject. From its earliest history, the business of the court seems to have proceeded in about one course. But when the authority for employing certain branches of practice is sought for, none other is discoverable than that the court at some early day began to

employ them; and ever after, on a recurrence of like circumstances in a suit, it was probably found more convenient to apply the means before used than to establish methods by positive appointment. This may be sufficient to create or sanction those uses; yet it is not accompanied by what ordinarily attends the growth of a rule of pleading or practice in other courts—the adjudication of the court upon the point, declaring or confirming the reasons for its introduction or continuance.

The civil jurisdiction of the admiralty is generally held to be according to the forms of the civil law, by which is understood, in the United States and England, the positive law of the Romans, exhibited in the compilations of Justinian, and not, as on the continent of Europe, the modern private laws of the various nations which adopted the Roman law. Its course of proceeding in the United States was originally appointed to be conformable to the same law, (Act Sept. 29, 1789; 1 Stat. 93,) and is remarkable for comprehension, brevity, celerity and simplicity. 1 Kent, Comm. 380. In relation to the point now under consideration, the method of drawing out the written pleadings, the civil law would supply us no satisfactory assistance. At various periods of the Roman jurisprudence, formalities and ceremonies abounded in the institution of actions and in the methods of conducting them, and a scrupulous observance of verbal niceties in the frame of process was exacted. Quintil. de Oratore, 3, 8. So, also, each proceeding in the cause was taken with an accompaniment of symbols and fixed phrases. 4 Gibb. Decline & Fall, c. 44; Bever, Rom. Laws, b. 2, c. 4. Primarily, the manner of instituting a cause was of the most rude and abrupt character. The plaintiff himself took the defendant, without warrant or precept, before the Praetor, oblato collo, (by the collar,) and the proceedings there seem to have been conducted ore tenus by the parties, in short assertions and replies, very like the ancient method of pleading reported in the Year Books. Adams' Rom. Ant. 193. And, as a remnant of such usages, viva voce libels are yet admissible in summary causes in the ecclesiastical courts, the processes of the canon courts being derivatives from the civil law. Clerke, Prax. Adm. tit. 19; Cockb. Ecc. Prax. c. 5; 1 Hall, Law J. 83. In process of time, the allegations or demands of the actor were presented in writing, in what was termed "libellus," or "libellus supplex." Gilb. Forum. Rom. 23; 2 Browne, Civil Law, (Ed. 1799,) 26; Adams' Rom. Ant. 220; Cockb. Ecc. Prax. Append. 59; 1 Hall, Law J. 81; Consett, Ecc. Prax. pt. 3, c. 1, § 1. It does does not appear to have been a subject of specific regulation in the civil law, (or in the French practice, which is closely modelled upon it,) as to what interests might be prosecuted jointly, or how far relief was restricted to the special manner in which the case

was charged or articled. The allegations of the parties might be expanded through a series of pleadings, sponsio, replicatio, duplicatio, triplicatio, etc., (Livy, b. 39; Cicero in Verr.; Id. in Cocc.;) yet the constituents of each particular pleading are not clearly defined by the books, (Spence, Orig. Laws; Sevigne, Hist. Rom. Law; 4 Gibb. Decline & Fall, c. 44.) The reasonable presumption, however, is, that these counter allegations were designed to maintain the controversy upon the allegations first propounded, and were not employed to determine the scope of the action or the competency of the actors to it. The libel was not required to correspond exactly with the demand put forth by the actor, either as to amount, time, place or thing. Just. Inst. b. 4, tit. 6. The only qualities apparently prescribed by the text of the law were, that the libel should state the complaint with distinctness, certainty and aptness, with a proper conclusion or prayer, and without being contradictory to itself. Wood, Inst. Civil Law, bk. 4, c. 3, § 3. This was no doubt the substance of the action given by the Praetor, whether one for which a precedent was found, or one devised for the particular case. Inst. bk. 4, tit. 6; Dig. bk. 2, tit. 13, § 1; Heinecc. Syntag. 673; 2 Browne, Civil Law, 349, 350. Whatever, then, might be comprehended within the action, might be properly made part of the complaint in the libel, and no interdiction to pleading in one action a right common to several parties, appears to have been made in the edicts or expositions of the laws.

Clerke and Browne consider the practice of the ecclesiastical courts in England to be the source from which that of the admiralty courts is drawn, and upon which it relies for authority. Clerke, Prax. Adm. tit. 19; 2 Browne, Civil Law, (Ed. 1799,) 149. This only removes the inquiry one step further, without affording a solution of the difficulty presented. For the ecclesiastical law of England was modeled from the canon law, and, in all defective or doubtful cases, recourse was had to the body of the pontifical canon law for authority and guidance. 4 Reeve, Eng. Law, cc. 24, 25. And then, again, proceedings in the courts of canon and civil law were considered identical. Bac. Abr. "Eccles. Courts, E."

It accordingly still remains to determine what the original rule—that of the civil law—was. Baron Gilbert regards a libel under the civil law, and a bill in the court of chancery, to have been the same in their structure. Gilb. Forum Rom. 44. In early practice, the bill in chancery was merely a petition to the chancellor, narrating the petitioner's case, and asking redress, without respect to form. Wyatt, Pract. Reg. 57; Wood, Inst. Civil Law, bk. 4, c. 3, § 3. Though subsequent practice has amplified and affected to give great formality to bills in chancery, yet they still retain the substance of the libel employed in the canon courts. Bart. Suit Eq. 19, 26. From the chancery court having been, for many ages, under the presidency of ecclesiastics, with whom the canon law was a rule both of conduct and of faith, it was natural that the proceedings of the one forum should be, as they proved in practice, common to both. We might, therefore, reason with tolerable directness, from the principles known to have been introduced into the court of chancery in respect to pleadings, as to what those principles were as then understood in the civil law. Yet we must be careful to discriminate between the practice and pleadings as known in the court of chancery during the early period of its history, and that which has grown up since the days of Lord Bacon and Lord Nottingham. The canon law only required in the libel a plain narrative of facts. 2 Browne, Civil Law, (Ed. 1799,) 79. Reeves says it must contain the thing in question, with the quality of the action. 4 Reeves, Eng. Law, 14. The ecclesiastical courts in England require the libel to be clear and explicit. 1 Hall, Law J. 81; 2 Browne, Civil Law, (Ed. 1799,) 101, 102. Consett says, that in the plenary proceedings the plaintiff's claim is set forth simply, in a continued speech or oration; or articulate, in which the merits of the cause are propounded by articles. Consett, Eccl. Prax. 402. The choice of these varieties seems to have been left wholly to the pleader. When the libel was obscure, uncertain, confused or preposterous, and exception was taken to it for such causes, the most liberal practice in respect to amendments prevailed. Id. pt. 3, c. 1, § 2. And they were commonly made instanter, at the suggestion of the excepting party. Cockb. Ecc. Prax. c. 5, § 4. And, though numerous provisions are made by the civil law for various defences against what are held to be, prima facie, efficacious actions, yet the defences relate in no case to matters of form. No system of rules seems ever to have been designed in the civil law, like those established by the common law, to destroy the plaintiff's action because he had framed or managed it inaptly. Just. Inst. lib. 4, tit. 13; Pandects, lib. 44, tits. 1, 2. Such, also, seems to be the case in the French courts, whose practice has been conformed with great exactness to that of the civil law. 13 Poth. Works. So far, therefore, as the pleadings in a cause were subject to regulation under the civil law, it would appear that little more than simplicity and perspicuity in their structure were required. It was sufficient if they plainly informed the court and the opposite party of the object sought, though they might be destitute of that technical fulness or unity of object which was exacted by the common law, and which has, in later times, grown into use in the court of chancery. None but substantial defects were regarded; and, if no exception was taken to the sufficiency

of a pleading, an amendment was permitted at any time before final sentence: and, when an exception was formally taken, the amendment might be made at any time before contestation of suit, (Consett, Ecc. Prax. pt. 3,) and at any time before sentence was pronounced, if the defendant had not previously excepted to the defects, (Id. pt. 3, § 2.)

The objections raised upon the defectiveness of the libel in the present case, were offered at the hearing of the cause after the proofs were all taken. They are said, however, to be in time, because they arise out of the testimony, the allegations of the libel importing that the libellants have a joint interest in the whole subject, while the proof shows that their interests are entirely distinct. I do not think the libel bears the interpretation put upon it by the respondent's counsel. In the introductory part it does, indeed, assert "that the libelants, by twenty-eight several policies, became underwriters upon the cargo of the brig Hercules." This language might perhaps indifferently bear the construction that each libellant subscribed all the policies, or that, the policies being several, they were so both in respect to the portions of cargo insured and to the parties underwriting. But the libel is made sufficiently distinct in this respect by the subsequent allegation, that the parcels were broken open at Key West, and the marks so defaced and altered that the libellants "were unable to identify the several parts and parcels thereof by them respectively insured as aforesaid." This denotes that the libellants were not joint insurers.

If any advantage could legally be taken of this want of joint interest, the respondent should have interposed the proper exception. But I do not think the fact of any importance, however it is brought to the notice of the court. The canon law permitted several actions to be joined in the same libel. 2 Browne, Civil Law, (Ed. 1799,) 79. And our own courts sustain libels uniting the most dissimilar interests. In The Amiable Nancy, the libel was filed by the owners of the vessel, the master, the supercargo and a mariner, for trespass to the vessel, and for an assault and battery on some of the libellants. Damages were awarded by this court for each of those causes of action, and its decision was sustained, on appeal, by the circuit court and by the supreme court. [Case No. 331;] 3 Wheat. [16 U. S.] 546. The practice of the court of chancery permits suitors who have a like interest in the subject matter to unite in a bill, though they are not to participate with each other in the recovery. Lloyd v. Loaring, 6 Ves. 773; Adair v. New River Co., 11 Ves. 429; Good v. Blewitt, 13 Ves. 397; Mitf. Pl. (Amer. Ed. 1816) 135 et seq. There is a manifest fitness and convenience in allowing parties in admiralty suits to join as libellants, whose interests rest upon a cause of action common to all, though

as between themselves their interests are separate and distinct, and I find no rule or principle of the civil law interdicting such junction. This libel, however, should be amended so as to state that the cause is prosecuted for the libellants and for all others interested who may come in and establish their rights in the subject matter. One action is enough to determine the right of the respondent in respect to the vessel and her cargo; and the judgment should be so far final as to protect him from any further proceedings in relation thereto. This would be so if the suit were in rem; and actions in personam and actions in rem being co-ordinate, and resting upon like principles in a court of admiralty, ought to be attended with the same result in this respect.

The second objection taken by the respondent is, that the libel is only adapted to a case of force or fraud, and that as neither of these is proved, no remedy can be had secundum allegata for a mere illegal privation of property. It is true that the libel admits of this exception. The brig was put in possession of the respondent by her master, both for the purpose of immediate relief from her peril, and to be afterwards piloted out of the reefs and into port. She was at that time in great danger, and required immediate assistance. Nor was there any force or fraud in conveying her to Key West. The testimony of Seaman, her master, though much more clear and explicit as taken before the commissioner than as given in court, yet in both cases agrees in this, that he did not urge the respondent to take the vessel to Mobile until she had got under weigh. The respondent was under no obligation to take her to her port of destination, there being an intermediate American port to which she could go with but slight interruption of her voyage. Neither is the respondent made a trespasser from the beginning by reason of any misconduct of his in Key West, or by his invoking the authority of the local court there. The allegations of the libel, which charge the respondent with obtaining possession of the brig by force or fraud, cannot be supported. But I attach no importance to these allegations. They may be treated as surplusage or as matter of aggravation, and the libellants are at liberty to strike them out, if they shall be so advised. The court proceeds upon the whole case as it is made out, without regard to what the libellants have denominated it, as in admiralty practice there is no discriminating appellation of actions. The remedy is upon the case made, and not in conformity to any nomenclature of the action.

I perceive nothing in the cases cited or in the argument urged, to support the third objection, namely, that this proceeding cannot be sustained in personam, but only in rem against the brig and her cargo to reclaim them in kind. There is no doubt of the power of the court to proceed with like authority in personam as in rem, where the

subject matter is within its jurisdiction. Blackstone admits that the first process in admiralty is frequently by arrest of the person. 3 Bl. Comm. 108; Smart v. Wolff, 3 Term R. 323, 330. This concession is fortified by the whole tenor of the practice of the court, and of decisions here and in England. Clerke's Prax. by Hall; Brevoor v. The Fair American, [Case No. 1,847.] There is no reason for requiring a different form of libel in respect to parties or causes of action in the one case from what is proper in the other. The seizure of the article and the monition consequent upon that, is equivalent to an arrest of the person, and was probably introduced as a substitute for a personal arrest; and it is not to be supposed that such attachment brings the subject matter in contestation more immediately before the court, than if the party were held in actual arrest. The character of the court and the subjects with which it deals render it of signal advantage to suitors that its functions can be exercised in relation to maritime matters with all the benefits of a personal summons or arrest of parties, without incurring the delays, if not impracticability, of making a personal service of process. That end is effected by seizing the subject which gives cause to the litigation.

But it is urged, that if the libel be sufficient in point of form, the matters charged therein do not make a case of admiralty and maritime jurisdiction, cognizable in this court, because the cause of action, if any, arose not out of the original taking possession of the vessel and her cargo upon the high seas, but from transactions subsequent thereto, on land, at Key West, within the body of a county, so that if any wrong was there committed, the libellants must seek redress in a court of law. It is not denied that if the original possession of the vessel had been wrongful, the act would have been a marine tort, and within the jurisdiction of this court. When the jurisdiction of a court of admiralty has attached, it is not divested by means of acts subsequently done on land and cognizable by the law tribunals. Jurisdiction in admiralty once acquired cannot be thus ousted. The after acts, when incidents of the first, are, in respect to jurisdiction, all regarded as one.

In this case, the cause of action is the taking and holding possession of the goods by the respondent, in the character and with the authority of salvor, to which all that subsequently transpired was incident. Over that principal act the court has undoubted jurisdiction, and it also has cognizance of every accessory act done on land, although not of itself sufficient to confer jurisdiction. 1 Kent, Comm. 379; Rex. v. Broom, 12 Mod. 135; Dean v. Angus, [Case No. 3,702.] Moreover, if the cause of action arose at Key West, it was in respect to property waterborne, and a sea-going vessel; and the admiralty jurisdiction embraces ports and havens

as a portion of the high seas. Nor is there evidence that the harbor of Key West is land-locked so as to be within the body of a county, and within the restriction of the English rule. Willets v. Newport, 1 Rolle, 250; Montgomery v. Henry, 1 Dall. [1 U. S.] 50. I am satisfied that, as a general rule, a party deprived of his property by any act on the high seas, whether that property be jetsam, flotsam or ligan, be abandoned by those who have charge of it, or be voluntarily delivered over by them to another without authority, has his remedy in this court, because the transaction is of a maritime character, without regard to any question of marine tort connected with the possession. De Lovio v. Boit, [Case No. 3,776.]

It is insisted for the respondent, that admitting the court at Key West had no jurisdiction, yet that objection had been waived by the assent of Seaman to the proceedings, and the subsequent composition and adjustment made by Earle with those claiming the cargo as purchasers under those proceedings. It is not necessary to inquire whether Seaman possessed authority to bind the libellants by the assent supposed, since the fact of the assent is not established. His appearance as a witness before the local court does not amount to a submission to the authority, which the court assumed, to award salvage and condemn the vessel and her cargo to sale, to satisfy its decree. He had no reason to suppose the court would do more than fix a reasonable compensation for the particular services rendered, and such compensation he professed a willingness to pay. When the court ordered a sale of the vessel and her cargo, he remonstrated against and excepted to the whole proceeding, and thus plainly evinced that he never assented to or acquiesced in the authority which the court undertook to exercise. As to the composition entered into by Earle, there is no question, that if one who is tortiously deprived of his property, freely and voluntarily compounds with the wrong-doer, the original tort is thereby extinguished, and cannot afterwards be made a ground of action, unless there was duress or fraud practised in obtaining the compromise. The $72,500 were not paid to the respondent to discharge his lien upon the property as salvor, but was paid to parties who claimed the absolute title to the property as owners, and who are not now before the court. Such payment, therefore, did not amount to a waiver of any rights whatever, as between the libellants and the respondent, at least without an express stipulation at the time to that effect. No contract or understanding of the kind is proved. It appears that Earle was unable to obtain the property in any other way. On the question of fact, therefore, whether the agent of the libellants acquiesced in the assumed ownership of the property, and paid the sum upon that footing, I am convinced, upon the evidence, that he did not, and that he in-

sisted upon a reservation of all the rights of his principals, and refused to take any steps that might impair them. Earle's testimony is entitled to full credit. It is corroborated, also, by all the facts in the case, and is called in question only in some particulars by the testimony of Mr. Whitehead, who, though he has no such fixed legal interest in the case as would make him an incompetent witness, is nevertheless so implicated in the transaction as to be under a strong bias of mind adverse to the libellants and in favor of the respondent, as his own integrity is involved in upholding the judgment of the court and the proceedings under it. I must, therefore, hold that the rights of the libellants remained, after the re-purchase or redemption of the property by Earle, in the same condition as before.

Since, therefore, the libel must be regarded as sufficient in matter of form and of substance, and the court has jurisdiction in the case, and the libellants have established claims against the respondent not waived by them, it remains to determine the extent of the respondent's liability.

The libellants demanded remuneration for all they have lost in consequence of the proceedings at Key West, on the ground that the act of the respondent in taking the brig into Key West was intentionally tortious, and that he is therefore liable for all the consequences of that wrong. But the evidence fails to establish any such wrongful intent. It has been already shown that he did not acquire possession of the brig by force or fraud, and did not retain her, by right of possession, against the demand of her owners, but handed her over to what was claimed to be the custody of the law. The decree of the territorial court having been unauthorized, he is liable to the extent of the property acquired by him under it, but he is not necessarily answerable for all the property the libellants have lost, into whosesoever hands it may have gone. It is evident that the respondent desired to go to Key West, yet there is not enough to charge him with bad faith in the proceeding. There is, indeed, ground for suspicion that he intended or hoped to secure a more favorable award of salvage at Key West than he could expect at any other of the places proposed. But there are not enough circumstances to warrant the conclusion that he resorted to Key West for the purpose of perpetrating a fraud upon the parties interested in the brig or her cargo. The utmost sum for which he can be held liable is the sum received by him as salvage, which is asserted by the libellants to have been $25,006 27; and it is not denied by the respondent that he obtained that amount.

On the other hand, the respondent rendered important services at a time when the brig was in a perilous situation on the reefs; and there is some reason for supposing that but for his timely appearance she would before long have been abandoned by her crew. He is, then, entitled to compensation therefor, unless he has, by his own misconduct, forfeited the right, not only to salvage, but to every other reward. If the charges made in the libel are sustained by the evidence, he has no claim to salvage. This court, having a broad discretion in cases of this character, takes into consideration the merits and motives of the salvor, in regulating the amount of salvage to be awarded him, in some cases giving a large proportion of the property saved, and in others diminishing it to a compensation for pilotage or mere labor, or denying it altogether. The Vrouw Margaretha, 4 C. Rob. [Adm.] 104; Mason v. The Blaireau, 2 Cranch, [6 U. S.] 240. It is charged upon the respondent that he neglected to inform the brig of her danger, though well aware of it, and fully able to warn her; that he predicted her grounding when he first fell in with her, and placed himself near the spot where it actually occurred, with a view to make a profit from the calamity which he was aware must befal her. The obligation which a vessel is under to warn another of a danger clearly discerned by her, but of which the other is ignorant, is so far an imperfect one that it may not supply a right of action by the party injured against the other for a neglect to comply with it. But if the party in fault comes into a court of justice seeking salvage for rescuing the other from a danger which he might have prevented, it is clear that all right to a salvage reward is destroyed. That is a recompense resting essentially upon equitable considerations. The respondent, if he claims as salvor, must present his claims with clean hands. The evidence to show that the respondent was aware of the danger to which the brig was exposed, consists of his declarations on board his vessel, his answer to the libel, and his conduct at the time the brig was in view before her disaster. His declarations are sworn to by the master and seamen of the Hercules; but their evidence is open to obvious objections, and their depositions, like all ex parte examinations, are to be received with the greatest caution, particularly as, in this case, their testimony before the commissioner was much more full and compromising to the respondent than their evidence as given in court. His own answer to the libel is not so explicit as could be wished. The navigation of those seas and the situation and employment of the respondent are to be considered in estimating the character of this answer. The Gulf-Stream at that place runs northerly at the rate of at least three miles an hour. A northeast wind raises the stream upon the Florida shore, and gives it a direction towards the land. From a minute chart of that section of the coast, previously made by the respondent, it appears that the current tends towards the spot where the Hercules grounded. No observation had been

taken by the brig for one or two days before the accident, on account of the weather, and the master of the brig was out of his reckoning. The respondent was perfectly familiar with the navigation of those seas. He must have been able to determine whether the master of the brig was a good pilot or not. He was himself bearing straight for the land, and he observed the brig on a course varying but three or four points from his own, tending towards a long line of reefs, and continually nearing a lee shore, where there was no harbor, and where the danger to her must continue for hundreds of miles. The master of the brig supposed himself to be on the other side of the Gulf-Stream. The respondent, in his conversation with his son, anticipated danger to the brig, not from any change of wind or weather, but from her course when he last saw her. He predicted that she would "be either on the Bahama banks or Carysfort reef." It is not easy to see why the Bahama banks were mentioned. They were from sixty to one hundred miles distant on the other side of the Gulf-Stream. The wind, the current and the direction of the brig, all tended from the Bahama banks towards the Florida reefs. The respondent added: "unless the captain was a good pilot." But how much confidence he placed in the ability of the "captain" may be gathered from his having advised his son that they had better remain where they were, to be ready in case of accident. If danger was equally to be apprehended from the Bahama banks, why should they both remain sixty miles from those banks, and within a mile of Carysfort reef? Why did the respondent come to anchor at mid-day? He says, because the weather was squally; but it is abundantly shown that the sea was smooth at the time the Hercules ran aground. From these and other circumstances, I am convinced that the respondent understood the danger to which the brig was exposed, and kept himself in readiness to take advantage of an accident to the brig, should it occur.

The remaining question is, whether the respondent was able to warn the brig of her danger. The vessels were two or three miles apart, running with the wind, upon courses differing only three or four points. It does not appear that there would have been any danger or difficulty to the respondent in bearing directly for the brig; and, though his son says that he bore away one point for the purpose of speaking the brig, but she hauled her wind, as he supposed, to avoid him, yet this is wholly unsupported by any other evidence, and, had it been true, it must have attracted the notice of some of the seamen or officers of both vessels. The respondent also would have set it up in his answer as evidence of his having discharged his duty, but he makes no mention of anything of the kind. It does not even appear that a flag was raised or a signal shown, and it is not to be assumed that the respondent was unable to warn the brig of her danger, without evidence of any attempt on his part to do so. His claim to salvage should, therefore, not be entertained. He has forfeited it by his conduct in the critical situation of the brig. He acted under a persuasion that she was about to incur the very danger which occasioned the acceptance of his services, and he manifestly contemplated all that occurred. This fact takes from those services, however opportune and indispensable, those meritorious qualities which characterize a salvage service.

At the same time, the respondent rendered valuable assistance to the brig. He did not bring her on the reef, and was under no legal obligation to get her off; and he might have left her there without incurring any personal responsibility. It is evident that the brig was in danger, and the aid he offered was accepted by the master. Nineteen men and two vessels were engaged six days in lightering the cargo and transporting it to Key West, and in piloting the vessel there, a distance of from ninety to one hundred miles. Without pretending to estimate with great exactness the value of the services rendered, I shall allow the respondent therefor the sum of $3,000.

The respondent must, therefore, pay into court the balance of the money received by him from the proceeds of the brig and cargo, with interest, after deducting $3,000. No costs will be allowed to the libellants, since the respondent, in retaining the money awarded to him at Key West, cannot be considered as wrongfully withholding it, as long as the right to it was not settled by a court of adequate authority. The clerk must ascertain the proportion that the respective interests of the libellants in the brig and such of her cargo as was stowed below decks bore to the sum received by the respondent. The deck-load was thrown over-board before the respondent came on board. The clerk will then ascertain and report the proportion due to each of the libellants according to their several interests. Decree accordingly.

NOTE, [from original report.] Upon the question raised by the plea to the jurisdiction, the opinion of this court was, that the legislative council of Florida did not intend, by the act of July 4th, 1823, to confer upon the courts of Florida any other powers or duties than those of common law courts; that the words wrecked property, in that act, were to be understood of wrecks at common law, namely, goods cast or left upon the land by the sea. (Sir H. Constable's Case, 5 Coke, 107; Jacobsen's Sea Laws, 540; Respublica v. Lacaze, 2 Dall. [2 U. S.] 122,) of which the English common law courts had jurisdiction; that the act was not intended to confer jurisdiction over cases of salvage upon the high seas; and that if it were so intended, the legislative council of Florida had no constitutional authority to confer such jurisdiction. The case of American Ins. Co. v. Canter, [Case No. 302a,] which arose about the same time in the district of South Carolina, presented the same question, and was decided

in the same way, but was carried by appeal to the circuit court, and finally to the supreme court of the United States, (1 Pet. [26 U. S.] 511,) where the decision of the circuit court reversing that of the district court was affirmed, and the point was settled, that though admiralty jurisdiction in the states could be originally exercised only by the district courts of the United States, yet the same limitation did not extend to the territories; that in legislating for them, congress exercised the combined powers of the general and state governments, and that the act of the territorial legislature of Florida, erecting a court which proceeded under the provisions of the law to award salvage and to decree the sale of the cargo of a vessel which had been stranded, and which cargo had been brought within the territorial limits, was not inconsistent with the constitution and laws of the United States, and was valid. The opinion of this court upon the point raised by the plea in this case is therefore omitted. On the 1st of February, 1826, about four months after the decree of the territorial court awarding salvage to the respondent, the act of the legislative council of Florida of July 4th, 1823, was annulled by an act of congress, (4 Stat. 138,) and, on the 23d of May, 1828, an act was passed by congress to establish a southern judicial district in the territory of Florida. (Id. 291.)